# EXHIBIT "C"

The Arbitration Institute of the
Stockholm Chamber of Commerce

2006 -06- 0 7

Arbitration No.    99/2004
Doc. No.    96

# FINAL AWARD

rendered in Stockholm 2 June 2006 in the matter of an Arbitration

between

**Su Zhou Tian Lu Steel Co., Ltd ("Tian Lu")**

*Claimant*

and

**Sherman International Corporation ("Sherman")**

*Respondent*

Case No. V (090/2004)

of the Arbitration Institute of the Stockholm Chamber of Commerce

### The Arbitral Tribunal

| | |
|---|---|
| Mr Lars Loman, Stockholm, Sweden | (Chairman) |
| Dr Wang Sheng Chang, Beijing, China | (Arbitrator) |
| Mr John F. McGinley, Pittsburgh, P.A., USA | (Arbitrator) |

It is hereby certified that this copy is in full conformity with the original.

ARBITRATION INSTITUTE OF THE
STOCKHOLM CHAMBER OF COMMERCE

Linn Bergman

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Final Award in the matter of an arbitration under the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce, Sweden

## THE PARTIES

**Claimant**

Su Zhou Tian Lu Steel Co Ltd (Arbitration V (090/2004 C)

Address: Su Zhou Tai Cang Fuqiao Zhen, 215434, China
Tel +86-021-66683210
Fax +86-021-66683209
Legal Representative: Mr Zhu Wei Min

Represented by Attorneys
Ms Zhou Liuliu / Mr Liu Changjin, Lawyers
Shanghai Kingstar Law Firm
Tel +86-021-68760440
Fax +86-021-68760240
E-mail: liuliu@kingstarlawyer.com

**Respondent**

Sherman International Corporation (Arbitration V (090/2004 R)

Address: 367 Mansfield Avenue, Pittsburgh,
P.A. 15220, USA
Tel +001-412-9282880
Fax +001-412-9282881

Represented by Attorney:
Mr Mark A. Grace,
Cohen & Grigsby, P.C.
11 Stanwix Street, Pittsburgh, P.A., 15222, USA
Tel +001-412-2974900
Fax +001-412-2090672
E-mail: jhannon@cohenlaw.com



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# CONTENTS

**PART A**

**THE FACTS AND THE RESPECTIVE STATEMENTS OF CASE**

1. The Parties
   - 1.1   The Contracts
   - 1.2   The Arbitration Clause
   - 1.3   Governing Law
   - 1.4   The Tribunal
   - 1.5   The Procedure before the SCC Institute
   - 1.6   Disqualification / Challenge of the Arbitrators
   - 1.7   The Procedural Orders
   - 1.8   The Oral Hearing
   - 1.9   Time for rendering the Award
   - 1.10  The resignation of the Arbitrator appointed by Tian Lu, Dr Wang Sheng Chang

2. The Claims for Relief
   - 2.1   Tian Lu
   - 2.2   Sherman

3. The basic circumstances

4. The further presentation by the Parties of their respective cases

**PART B**

**OPINION**

1. Technical points of departure
2. Summary of the respective positions of the Parties
3. The Contracts
4. The Tribunal's findings
5. The consequences, in principle, of Tian Lu not being entitled to avoid the Contracts on the first legal ground pleaded
6. The costs.

**PART C**

**THE FINAL AWARD**



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 2:06-cv-00883-TFM Document 61-4 Filed 06/26/08 Page 5 of 23
Case 2:07-cv-01325-KXC (C.43 Document 24 NYCFiled 08/02/2007 Page 17 of 35

4

## PART A

### 1. The Parties

Su Zhou Tian Lu Steel Co Ltd, (hereinafter "Tian Lu") is a company duly incorporated under the laws of China, engaged in the business of manufacturing steel products.

Sherman International Corporation, (hereinafter "Sherman") is a company duly incorporated in Pittsburgh, Pennsylvania, USA, engaged, *inter alia*, in the business of selling used iron and steel equipment.

### 1.1 The Contracts

The present dispute between the Parties arises out of the performance of a series of contracts (the "Contracts") for the sale of the Blawnox Duo Cold Mill located in ISG Burns Harbor, Indiana, USA (the "Mill").

The general contract incorporates or refers to four other contracts.

The Contracts are the following:

(1)  General Contract no. SHLP-2003-011-I-I (hereinafter "Contract 1")
(2)  Contract no. SHLP-2003-011-I-A (hereinafter "Contract 2")
(3)  Contract no. SHLP-2003-011-I-B (hereinafter "Contract 3")
(4)  An unnumbered Contract, which provides that Tian Lu shall pay to Sherman an amount of USD 60,000 prior to the start of dismantling of the Mill (hereinafter "Contract 4")
(5)  Contract no. SHLP-2003-011-I-D (hereinafter "Contract 5")

### 1.2 The Arbitration Clause

The arbitrability of the dispute is governed by an Arbitration Clause which appears in the Contracts and pursuant to which all disputes in where the Parties fail to reach settlement by friendly consultations shall be submitted to Arbitration, to take place in Stockholm, Sweden, in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (hereinafter referred to as the "SCC Institute").

### 1.3 Governing Law

The Contracts do not include a choice of law clause. However, the Parties have agreed during the course of these arbitration proceedings that the UN Convention on Contracts for the International Sale of Goods (hereinafter referred to as the "CISG") shall govern these Contracts. However, to the extent that the CISG is silent Tian Lu has claimed that Chinese law should apply in the first place and Swedish law in the second place, whereas Sherman has claimed that Swedish law shall be the governing law to the extent that the CISG is silent.

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

### 1.4 The Tribunal

Tian Lu has appointed as Arbitrator Dr Wang Sheng Chang, Beijing, China.

Sherman has appointed as Arbitrator Mr John R McGinley, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, USA.

On 2/9 November 2004, the SCC Institute appointed Mr Lars Boman, Partner at Advokatfirman Morssing & Nycander AB, Stockholm, Sweden, as Third Arbitrator and Chairman of the Tribunal.

### 1.5 The Procedure before the SCC Institute

On 4 October 2004, Tian Lu filed its Request for Arbitration including its preliminary Claim for Relief.

In its Reply dated 28 October 2004, Sherman denied Tian Lu's claims and filed a Counterclaim including, *inter alia*, that Tian Lu be ordered to perform in full under the Contracts and to pay the remaining part of the total purchase price.

Both Parties were ordered by the SCC Institute to deposit a certain amount as an advance on costs proportional to the amount of their respective claims.

Since Sherman did not pay its share of the advance within the time stipulated by the SCC Institute, the Institute dismissed the Counterclaim on 15 February 2006 and fixed the advance on costs at EUR 121,000 to be paid in equal shares, i.e. 50/50 by the Parties.

Since Sherman did not pay its share, Tian Lu provided the entire advance and the case was referred to the Arbitral Tribunal on 20 April 2005.

### 1.6 Disqualification / Challenge of the Arbitrators

None of the Parties has raised any objections to the appointment of any of the Arbitrators and, to the best of the knowledge of each of the Arbitrators, no circumstances exist which could lead to disqualification or challenge of such persons.

### 1.7 The Procedural Orders

The Tribunal has issued Procedural Orders on 2 May 2005, 8 July 2005, 10 October 2005 and 20 February 2006. In addition, there have been a number of contacts of an administrative nature with the attorneys for the Parties.

### 1.8 The Oral Hearing

Although neither of the Parties directly requested that an Oral hearing be held, in light of the fact that the dispute involves both contractual and technical matters of considerable complexity the Tribunal decided, by its Procedural Order no. 3, dated 10 October 2005, in accordance with Article 25 of the Arbitration Rules of the SCC

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 2:06-cv-00883-TPM Document 61-4 Filed 06/26/08 Page 8 of 23
Case 2:07-cv-01323-FXC Document 2-2 Filed 10/01/2007 Page 18 of 35

6

Institute, that an Oral hearing would be held at which the Parties would be able to present their respective cases in greater detail and to adduce evidence on contractual and technical matters.

An Oral hearing took place in Stockholm on 9 and 10 March 2006.

### 1.9 Time for rendering the Award

The SCC Institute, having previously extended the time for rendering the Award until 15 April 2006, has, by an additional decision dated 12 April 2006 and for the reasons addressed below, decided that the time for rendering the Award be extended until 2 June 2006.

### 1.10 The resignation of the Arbitrator appointed by Tian Lu, Dr Wang Sheng Chang

Subsequent to the Oral hearing, the three Arbitrators have discussed the merits of the respective cases of the Parties and agreed, in general terms, on the outcome of the Arbitration, subject to a draft along these lines being provided by the Chairman. However, after commencement of this drafting work the Chairman of the Tribunal was informed by the SCC Institute that the Arbitrator appointed by Tian Lu, Dr Wang Sheng Chang, had resigned from his appointment and that at present, he cannot be reached.

By a letter to the SCC Institute the remaining Arbitrators, Mr McGinley and Mr Boman, requested that the SCC Institute, pursuant to Article 16, Item 7, of the Arbitration Rules, decide whether the remaining Arbitrators should proceed with the Case by rendering an Award.

Having communicated with the Parties, the SCC Institute decided on 9 May 2006 that the remaining Arbitrators should now proceed and render an Award.

As mentioned above, the time for rendering the Award has been extended up to and including 2 June 2006.

### 2. THE CLAIMS FOR RELIEF

### 2.1 Tian Lu has claimed

(1) that Sherman be ordered to refund to Tian Lu an amount of USD 1,485,000, which has been paid by Tian Lu to Sherman as a part of the purchase price;

(2) that Sherman be ordered to pay to Tian Lu an amount of USD 304,694, including Import Custom, for Shanghai Entry-Exit, Inspection Fee and Commission Fee;

(3) that Sherman be ordered to pay interest at the Libor rate of interest as from the date of the payment of the respective parts of the purchase price;

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 2:06-cv-00883-TFM   Document 61-4   Filed 06/26/08   Page 8 of 23
Case 2:07-cv-01323-PKC   Document 112   Filed 10/01/2007   Page 20 of 35

7

(4) that Sherman be ordered to pay all costs incurred in the Arbitration proceedings including those of the SCC Institute and the Tribunal, and Tian Lu's costs and its Attorney's disbursements and fees and interest on such amounts as from the date of the Award, at the Libor rate of interest.

Alternatively, and in any event, Tian Lu has claimed

that Sherman, who is no longer able to deliver the Mill to Tian Lu, would be unjustly enriched in the event Sherman is entitled to retain the part of the purchase price which has already been paid by Tian Lu and, accordingly, that the Tribunal should render a reasonable award based on principles of equity and fairness.

## 2.2   Sherman

Sherman has denied that it is liable for any of the Relief sought by Tian Lu.

Sherman has accepted, *per se*, that Tian Lu has paid USD 1,425,000 and USD 60,000 (in total USD 1,485,000).

Sherman has also accepted, *per se*, the amount claimed in respect of custom and other costs.

Sherman has accepted, *per se*, Tian Lu's method of calculating the interest.

Sherman has claimed that it has suffered a loss of profit as a result of Tian Lu's non-performance under the Contracts.

## 3.   THE BASIC CIRCUMSTANCES

According to the General Contract (referred to hereinafter as "Contract 1"), Tian Lu purchased from Sherman the Mill, which was located in ISG, Burns Harbor, USA. The total purchase price was USD 3,900,000. As the Parties had agreed on a certain installment plan for the payment of the purchase price, they agreed to split the project up into five contracts reflecting the amount of each installment.

At the end of January 2004, Tian Lu made the first payment in the amount of USD 1,425,000 according to Contract 1 and Contract 5 for the drawings of the Mill. Upon receipt of this amount, Sherman packed and shipped the related drawings and technology documents to Predong Airport, Shanghai, China. Tian Lu thereafter paid customs duties, etc. in respect of these goods.

On 14 April 2004, Tian Lu paid an additional amount in cash of USD 60,000 in accordance with Contract 4.

By a Declaration of Avoidance of the Contracts dated 10 June 2003, Tian Lu sought to avoid the Contracts on the ground that the Mill was not in conformity with the

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Contracts and did not have the capability of the Mill as described in the Contracts, that the aforesaid constituted a fundamental breach of contract, and that the amounts paid should be refunded together with interest.

Tian Lu reserved its right to claim compensation for other damage and loss.

Sherman denied that there were any grounds for avoidance of the Contracts and claimed that the Mill was in conformity with the agreements, since Tian Lu had requested to buy this specific Mill from their owner (ISG) and after due inspection, even before Sherman was contacted. Since the Parties have not been able to settle their differences amicably, the dispute has been referred by Tian Lu to arbitration.

Therefore, the key issue in this Arbitration is whether or not the Mill was in conformity with the Contracts.

During the course of the Oral hearing, Sherman provided information that the Mill, which had previously been stated to be tendered for delivery, has been sold to another buyer and that delivery to Tian Lu is no longer possible in the event Tian Lu is not entitled to avoid the Contracts in full.

4. **THE FURTHER PRESENTATION BY THE PARTIES OF THEIR RESPECTIVE CASES**

**Tian Lu**

Tian Lu intended to invest in and establish a product line for cold-rolled products at the beginning of 2003. The Contracts were entered into in Shanghai on 15 November 2003, whereupon Tian Lu purchased from Sherman the used Blawnox Duo Cold Mill located in ISG, Burns Harbor, USA, at a purchase price of USD 3,900,000. The project was split up into five contracts forming an installment plan for the payment of the purchase price.

At the end of 2004, Tian Lu made the first payment in the amount of USD 1,425,000 according to Contracts 1 and 5. After receiving the amount, Sherman packed and shipped the related drawings and the technology documents in respect of which Tian Lu had paid customs duties and inspection and commission fees. On 14 April 2004, Tian Lu made cash payment in the amount of USD 60,000 in accordance with Contract 4.

After having received the drawings and the other documents Tian Lu invited an expert to check these documents. It was then found by him that some crucial documents were missing, which should have shown two important parameters, namely the rolling meters and the rigidity. These two parameters were important factors for the understanding of the true nature of the Mill and thus Tian Lu immediately requested to be provided with documents which included these figures. However, Tian Lu never received any reply in writing. Tian Lu was informed orally by Sherman that the rolling rigidity was 430 per millimeter, but Sherman never provided any information in respect of the rolling meters.

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

9

When Tian Lu's Working Group arrived in the USA, the request for these documents was repeated, but Sherman refused to provide them.

On the basis of the other information obtained, Tian Lu's experts drew the conclusion that the Mill was not a "cold mill" but a "temper mill", which was not in compliance with the Contracts.

On 28 May 2004, Mr Yang Yunfa of Tian Lu informed Sherman by fax that the Mill was not a cold mill but a temper mill, which was admitted by Sherman by a fax letter dated 1 June 2004.

Since it was Tian Lu's intention to buy a cold mill, but Sherman had delivered a temper mill and accordingly the Mill was not in conformity with the mill being the "object of the Contract", Tian Lu avoided the Contracts and requested refund of the payments made.

Sherman rejected Tian Lu's request.

On 18 June 2004, Mr Sharma, the Executive President of Sherman, negotiated with Mr Zhu Wei Min, the President of Tian Lu in Shanghai. Mr Sharma suggested that the Mill be changed into a single cold mill, but the Parties were unable to reach an agreement to this effect. Accordingly, Tian Lu has been forced to initiate Arbitration proceedings to obtain a refund of what has already been paid, given also that these payments, although formally attributable to separate contracts, constituted merely parts of an installment program and that the drawings had no value *per se* unless part of the total sale of the Mill.

Sherman

Sherman has denied that it is liable for any of the relief sought by Tian Lu.

Sherman has claimed that Tian Lu materially breached the Contracts and that Sherman, for the following reasons, has no further obligations to Tian Lu.

Tian Lu selected a specific used Mill, and thereafter sought out Sherman to buy, dismantle and relocate the specific used Mill. Tian Lu agreed to purchase the Mill from Sherman "as is".

Sherman relied upon its agreement with Tian Lu and took steps to purchase the thus identified mill so that it could sell and deliver it to Tian Lu.

The Mill in dispute was, specifically, the Blawnox Duo Cold Mill, located in Burns Harbor, Indiana, USA. Tian Lu did not request a certain type of mill and did not provide any specifications that were to be met. Rather, Tian Lu specified this particular mill.

Each of the contracts executed on 15 November 2003 covered a different part of the sale, *inter alia*, one of the Contracts covered the sale of the software and manuals

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

concerning the Mill. When Tian Lu had paid Sherman an amount of USD 1,485,000 under Contracts 5 and 4, Sherman also delivered the software, manuals, drawings and technical documentations for the Mill. However, on or about 10 June 2004, Tian Lu sent Sherman a document purporting to cancel or avoid the Parties' agreement and has since refused to pay the further installments and to perform any of its obligations under the agreement.

For these reasons, Tian Lu's claim that the Mill does not conform to the description in the Contract documents because it is not a "cold mill" is denied.

The Mill was sold on an "as is, where is" basis and no representations were made in the Contracts as to the capabilities or specifications of the equipment being sold. Sherman provided no warranties concerning the Mill. On the contrary, the Contracts specifically state that there is no warranty concerning the "suitability" of the equipment.

The only specification in the Contract is that Tian Lu decided to purchase the specific used Blawnox Duo Cold Mill located in Burns Harbor, Indiana, USA.

Sherman has provided Tian Lu with exactly what Tian Lu contracted for and specifically requested, i.e. the Blawnox Duo Cold Mill in Burns Harbor, which Tian Lu asked Sherman to buy for them.

Sherman did not know of Tian Lu's intention to purchase a certain kind of cold mill prior to the execution of the Contracts and it was Tian Lu who approached Sherman and specified the exact mill that Tian Lu decided to purchase. Sherman was simply complying with Tian Lu's wishes.

Furthermore, Tian Lu had the opportunity to inspect the Mill to determine if it really met its needs. In fact, Tian Lu had already inspected and chosen the Mill even before approaching Sherman to arrange for the purchase of the Mill. This was documented in the Contracts, which specifically state that both parties had inspected the Mill before the Contracts were executed. Consequently, Tian Lu knew, upon inspection, whether the Mill would meet its needs and had concluded that it would.

Tian Lu has misconstrued the meaning of the term "cold mill". A temper mill is, in fact, a kind of cold mill. There are two fundamental types of steel mills: hot and cold. In the cold mill classification there are two general subclasses; temper mills and cold reduction mills. It is correct, though, that the capabilities of a temper mill, as compared to a cold reduction mill, are different in the sense that a cold reduction mill is capable of reducing the thickness of the steel plate to a greater extent than a temper mill.

In Sherman's "Products Catalogue", both "cold mills" and "temper mills" are listed under the comprehensive heading of "Cold Rolling Mills".



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

## Tian Lu

When representatives of Tian Lu went to the USA and made contact with Sherman, Tian Lu was not provided with any essential technical documents or drawings which would enable Tian Lu to know, in greater detail, the capabilities of the Mill. However, Tian Lu made it abundantly clear during the subsequent negotiations that Tian Lu's intention was to buy a cold mill.

Therefore, Sherman was undoubtedly aware of Tian Lu's intention. Sherman drafted the Contracts accordingly and all of them refer to the Mill as a cold mill and not a temper mill. Not only did Sherman, which is a professional company engaged in the business of selling iron and steel equipment, make oral representations that the mill was a cold mill, it also represented and agreed to this by the wording of the Contracts.

Therefore, the true circumstances, i.e. that the Mill was a temper mill, were not revealed until Tian Lu, for other reasons, began to doubt whether the Mill, represented by Sherman as being a cold mill, had the capabilities of such a mill.

The reference by Sherman to the term that the Mill was sold on an "as is, where is" basis is not valid. Firstly, the Mill has to be a cold mill and, if it is not, the "as is, where is" term is irrelevant. Secondly, Sherman must have known that the Mill was not a cold mill. However, Sherman nevertheless sold it to Tian Lu. In light thereof, Sherman did not act good faith.

The Contracts imposed no duty on Tian Lu to inspect the Mill. However, in the contract between Sherman and ISG, the owner from whom Sherman acquired the Mill, Sherman had acknowledged that it had inspected the Mill.

It is correct that there are two main types of rolling procedure, hot rolling and cold rolling, and that both temper mills and cold mills are, in principle, mills used in the cold rolling process. However, there are great differences between temper mills and cold mills with regard to their capabilities. The main objective of a cold mill is to achieve a reduction in the thickness of the metal and it is usually used as the first step in the cold rolling process.

A temper mill does not significantly reduce the thickness of metal. The main function is to permit a better control of flatness and surface finish. A temper mill is usually used as the last step in the cold rolling. Although both temper mills and cold mills are used in the cold rolling process, they cannot replace each other. The equipment which Tian Lu intended to buy and which was confirmed by the Contract, is a "Duo Cold Mill" or a "2 Stand Cold mill" as represented in the Appendix to the Contracts, but not a temper mill or a "2 Stand Temper Reduction mill" as actually and confusingly referred to in the drawings received by Tian Lu after the payment of the amounts now in dispute.

Consequently, the word "Duo" means "2 Stand", but not "two capacities" as claimed by Sherman at an earlier stage of the dispute.



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

12

It is not possible that Sherman, as a professional seller of used iron and steel equipment, did not know the difference between a cold mill and a temper mill.

Further, the "Technical information and Drawings" provided by Sherman were not the originals, but only copies, and thus are not in conformity with the Contracts.

It should be noted that, pursuant to the contract between Sherman and ISG, from which company Sherman purchased the Mill in order to sell it to Tian Lu, Sherman had the option to cancel the agreement with ISG at any time or without reason or cause and did not assume any business risk at all. Tian Lu has, on the other hand, suffered significant economic loss including, but not limited to, the payments already made. This is unfair.

Tian Lu would never have entered into the Contracts had it been disclosed to Tian Lu that the Mill was only a temper mill and not a cold mill with all the capabilities of such a mill.

Sherman

Tian Lu, in fact, had full knowledge of the Mill's capabilities prior to contracting with Sherman, rendering moot any argument that Sherman misrepresented those capabilities.

Tian Lu had previously attempted to purchase the Mill through another broker and competitor of Sherman, Casey Equipment Corporation, and Tian Lu had conducted a detailed inspection in September 2002 to determine whether the Mill met its needs. In April 2003, the engineer conducting the inspection issued a detailed written report (the "Report") of his findings, accompanied by the Mill's equipment specification. After a thorough analysis of the capabilities of the Mill and of the advantages and disadvantages of purchasing it, the Report concludes that the Mill constituted a good set of equipment and purchase thereof was recommended. Therefore, Tian Lu undoubtedly knew of this Report and its content several months before entering into the agreement with Sherman to purchase precisely this Mill. It should be noted that the manager, Mr Yang Yunfa, who was sent to inspect the Mill together with the engineer making the Report, was the same individual who first questioned Sherman concerning the Mill's capabilities in May 2004. Therefore, Tian Lu is misrepresenting the time at which it first learned of the Mill's capabilities.

Further, in April 2004, Tian Lu sent several personnel to inspect the Mill and provide some guidance to Sherman as to the specific equipment desired and whether any of the equipment should not be shipped to Tian Lu in China. Despite the fact that these Tian Lu personnel had a sufficiently high level of expertise to direct what equipment was wanted by Tian Lu and, therefore, an awareness of the type of mill equipment desired by Tian Lu, they gave no indication that the Mill was not of the type desired and requested by Tian Lu. It was not until several months later, on 28 May 2004, that Mr Yang Yunfa questioned the type of mill.

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 2:06-cv-00883-TBM Document 61-4 Filed 06/26/08 Page 14 of 23
Case 2:07-cv-01323-FXC Document 2 NYCAP Filed 10/01/2007 Page 26 of 35

13

Therefore, Tian Lu was fully aware of the Mill's capabilities at the time of contracting and the condition contained in the contract that the Mill was sold on an "as is, where is" basis should be given full force and effect.

The drawings were in "micro fish" format and, therefore, a type of original. There were no other originals.

**Tian Lu**

It was not until during the Oral hearing in these arbitral proceedings that it was revealed by Mr Sharma, the owner of Sherman, that the Mill has been sold to a third party following Tian Lu's avoidance of the Contracts.

Accordingly, it is incorrect, as stated by Sherman in its reply to Tian Lu's Request for Arbitration, that Sherman stands ready to perform its obligations under the agreements. Sherman is obviously unable to perform under the Contracts by delivering the equipment in the event the Tribunal does not accept that Tian Lu is entitled to avoid the Contracts.

Under these new circumstances, in the event Tian Lu is not entitled to avoid the Contracts, Sherman should not be entitled to retain what has been paid by Tian Lu, since Sherman would otherwise be unjustly enriched thereby. This would not be in accordance with general principles of equity and fairness.

5.    **THE LEGAL REFERENCES**

The Parties have referred to a number of Articles in the CISG, in particular Article 8 on the intent of the Parties, Article 40 and Article 7, Articles 44 and 45 as regards the duty to deliver goods in conformity with the Contract and fundamental breach of contract, Articles 49 and 26 on avoidance. Further, reference has been made by Tian Lu to Articles 74 and 81 as to restitution of what has been performed. (No references have been made to, e.g. Articles 77 or 81.)

6.    **THE EVIDENCE**

The Parties have relied on documentary evidence and testimony. The documentary evidence relied upon has been listed in Statements of Evidence submitted by the Partiers.

Tian Lu has relied upon the testimony of Professor Chen Qiàn, Central Iron & Steel Research Institute, Institute of Structural Materials, Beijing, China, and Professor Jiang Junpur, Metallurgical Research Center, School of Metallurgical and Ecological Engineering, University of Science of Technology, Beijing, China.

Tian Lu has also relied upon evidence given by Mr Zhu Wei Min, owner of Tian Lu as applied for during the Oral hearing and accepted by Sherman.



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

14

Sherman has relied on the testimony of Mr Vikrant Sharma and Mr Om Sharma of Sherman.

The Arbitrators have considered all evidence thus relied upon by the Parties.


## PART B

## Opinion

### 1. Technical Points of Departure

The dispute before the Arbitrators includes not only legal matters of some complexity but also technical matters which are no less complex.

The dispute turns on the cold rolling process and the difference, if any, between cold rolling and temper rolling and a cold mill and a temper and cold reduction mill.

Having heard the expert evidence relied upon by Tian Lu and studied Tian Lu's Appendix 16 of its Schedule of evidence, the Tribunal is confident that, although both temper rolling and cold rolling are terms applied to the operation of passing unheated metal through rolls and although temper rolling might also include a slight reduction of the steel sheet, there is a significant difference between the two processes.

The purpose of cold rolling and the normal meaning of this term is to reduce the steel sheet to the desired thickness by 80 – 90 % of the gauge of the hot-rolled steel sheet (normally down to 0.2 – 0.4 millimeters).

A cold mill is normally comprised of several major units, among them the reduction mill and the temper mill.

The cold rolling in a cold mill is normally a 4–5 stand procedure. The temper and reduction mill procedure is normally a two-stand procedure.

Temper rolling is a process the purpose of which is to develop the proper stiffness temper in steel, improve the flatness to a certain extent and impart a desired surface finish.

### 2. Summary of the respective positions of the Parties

Tian Lu has claimed that the Mill they intended to buy and which was the "object" of the Contract was a cold mill possessing the capabilities of such a mill, i.e. including as its main function the capability of reducing the gauge of the hot rolled steel to 0.2 – 0.4 millimeters, but that the Mill has subsequently proved not to be a cold mill with these capabilities but a temper mill with a function which is not to so reduce the gauge but, instead, the function of improving flatness, gauge and surface, normally as the last phase only of a cold rolling procedure.



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Therefore, Tian Lu has claimed that the Mill is not in conformity with the Contracts and, accordingly, the Contracts have been avoided by Tian Lu.

Sherman has claimed that, from a technical general point of view, the Mill, albeit a temper mill, falls within the definition of a cold mill since temper milling is a kind of cold rolling process. Further, Sherman has claimed that a temper mill is capable of reducing the gauge of the steel, although not to the same extent a cold mill. Sherman has also referred to Exhibit A of Contract 2, wherein reference is made to "2 Stand Tandem Cold Mill [Duo Mill]" by which the buyer is informed that this involved a two-stand cold mill only and not a 4-5 stand mill.

Apart from Sherman's position in purely technical respects, Sherman's main position is that Tian Lu approached Sherman and appointed Sherman on its behalf to buy a specific mill by way of resale contracts, which Tian Lu had already inspected and chosen and in respect of which Tian Lu had previously been in purchase negotiations through brokers (Casey), with the original owners, ISG.

Therefore, whatever the intention of Tian Lu, Tian Lu purchased through Sherman a mill which they had already found was suitable for their purposes; Tian Lu did not appoint Sherman as their expert in finding a mill meeting certain criteria.

Tian Lu has claimed that Sherman, following its contacts with the original seller and obviously even having a copy of the Report, was fully aware of the fact that the Mill was a temper mill and not a cold mill, the normally assumed capabilities of such a mill with a main function of being capable of reducing the steel down to 0.2 – 0.4 millimeters, and that Sherman acted in bad faith by purchasing and selling the Mill to Tian Lu without specifically stating that it was not a cold mill, but, rather, a temper mill.

Sherman has claimed it did not act as an expert and adviser to Tian Lu assisting Tian Lu to find a suitable mill and that Tian Lu had already found the mill they wanted. Sherman only agreed to act as a formal purchaser from ISG and resold the Mill to Tian Lu.

3. **The Contracts**

According to Section 1 of the Contracts, the "object" of the sale and purchase was the Equipment defined as the "used Blawnox Duo Cold Mill". However, in Contract 3 for the supply of the software manuals, reference is made to a "2 stand cold rolling mill". In Contract 4, on the payment of the USD 60,000, reference is made to the "Blawnox Duo Mill" at ISG, Burns Harbor, USA. The same reference is made in Contract 5 in respect of the drawings.

Contract 2 contains a reference to the equipment as being described in Appendix 1 as sold on an "as is, where is" basis and as inspected by buyer and seller on 15 November 2003 and in an exhibit, referred to as Exhibit A, Part 1, to Contract 2, under the heading

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

16

"Scope of Supply", the Mill is referred to as "One Blawnox Two-Stand Tandem Cold Mill [Duo Mill] as is, where is including . . . ".

Thus, the Mill is defined differently to some extent in the various contract documents.

4.    The Tribunal's findings

The Tribunal has duly considered the submissions of both Parties and their witnesses and finds as follows.

As referred to above, it has been established by expert evidence - and this now seems to be common ground - that the Mill sold by Sherman to Tian Lu under the Contracts is a temper mill and that, although it is capable to some extent of reducing the thickness of the steel sheet, its main function is to improve flatness, eliminate discontinuous yielding and improve the surface of the steel sheet.

Thus, there is a difference, *per se*, between a temper mill and a cold mill.

However, the fact that reference is made in some of the Contract documents to a 2 stand mill (as per the Exhibit to Contract, a "2 stand tandem cold mill (Duo Mill)" there is at least an indication in the Contracts that the Mill is not that kind of cold mill, which includes 4–5 stands, but only 2 stands.

In the Tribunal's view, there is no doubt that the subject-matter of the sale could have been more accurately defined or described in the Contracts. Had the Mill been tendered for sale in the market by Sherman it should properly have been presented as a temper mill or a reduction mill, which it is, and not as a cold mill or a duo cold mill, which might be misleading, although a temper mill has some, albeit limited, cold rolling capabilities.

In the underlying Asset Sales Agreement (Appendix 17 to Tian Lu's Statement of Evidence), this Mill was designated as a Duo Mill, more specifically described in Exhibit A as a ..."two stand Tandem Cold Mill (same as Appendix A to the Tian Lu Contracts). As seems to have been accepted by Sherman at the Oral hearing, there is no support in the evidence for the view that the word "Duo" is intended to define the Mill as having two capabilities, one being a full reduction capability and one being the temper rolling capability, as claimed by Sherman at a previous stage in the Arbitration proceedings.

However, and although the definition of the subject-matter of the sale pursuant to the Tian Lu Contracts seems confusing and even misleading to a certain extent, the Tribunal finds that Sherman's main position is valid, namely, as is common ground, that Tian Lu appointed Sherman to buy a specific mill which Tian Lu had already inspected and which was defined in the Contracts as the "used Blawnox Duo Mill located in ISG, Burns Harbor, USA".

Although the Tribunal agrees with Tian Lu that the "as is, where is" term is only secondarily relevant, the question remains whether Sherman's duty of good faith

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

under the CISG or Swedish or Chinese law would, under the present circumstances, include a duty to clarify in all respects, and under a liability as adviser to Tian Lu, whether Tian Lu had actually chosen to buy a mill which was suitable for its needs and its intended production. In the Tribunal's view, there is insufficient evidence that Sherman's role included such responsibility and the Contracts expressly support this conclusion.

A probable explanation to this dispute might be that Tian Lu was not provided with correct – or misunderstood – information from Casey or ISG at the expert inspection made by Mr Zhu in connection with his visit to the Blawnox Mill in September 2003 together with Tian Lu's owner, Mr Yang Yunfa, which information subsequently formed the basis for the Report dated 30 April 2003. The Tribunal has noted, though, that although the translation of the Report, which refers to a double cold reduction mill (DCR mill) may not be quite accurate, nevertheless the Specifications provided by Casey, to which the Report makes reference, in turn refers to a "two stand DCR mill".

Therefore, since there is no other evidence that Sherman acted intentionally to mislead or otherwise in bad faith, the Tribunal concludes that there are insufficient grounds for an avoidance of the Contracts in this respect. Tian Lu's claim must, therefore, fail insofar as it is based on the legal ground that the Mill was not in conformity with the Contracts.

5. **The consequences, in principle, of Tian Lu not being entitled to avoid the Contracts on the first legal ground pleaded**

Since the Tribunal has found that Tian Lu is not entitled to avoid the Contracts in so far as based on the legal ground that the Mill was not in conformity with the Contracts, the Parties should, in principle, act and perform as stipulated in the Contracts (and under the CISG), i.e. Sherman should be obliged to deliver the Mill and Tian Lu obliged to pay the remainder of the total purchase price.

At an early stage of the dispute, as expressed in Sherman's Reply to Tian Lu's Request for Arbitration, Sherman was standing ready to perform its obligations in respect of payment of the amount stated in the Agreements. However, Sherman announced at the Oral hearing in this Arbitration that the Mill had been re-sold to a third party. The details of that sale of the Mill have not been provided by Sherman but the fact remains that Sherman is not able to perform under the Contracts with Tian Lu in the event that Tian Lu now, the Tribunal having found against Tian Lu in respect of its claim for avoidance, performs its duties by taking delivery and paying the remainder of the purchase price.

Having announced at the Oral hearing that the Mill has been sold to a third party, Sherman also stated that it had suffered a loss due to Tian Lu's non-performance under the Contracts and that Sherman now had "a counterclaim" against Tian Lu corresponding to that loss.

The Tribunal actively sought a reaction and clear positions from both parties in respect of this new situation. In particular this included whether, and if so, to what extent,

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Sherman should be entitled to retain what had already been paid by Tian Lu as part payment, now that Sherman is unable to perform under the Contracts by supplying the Mill and under what circumstances it would be relevant for Sherman to raise a "counterclaim" given that, if Tian Lu lost its claim for avoidance, Tian Lu would, in principle, be obliged to pay the purchase price. On the other hand, if Tian Lu's claim for avoidance would be accepted by the Tribunal, there would hardly be any ground for Sherman to claim any compensation whatsoever from Tian Lu.

However, both Parties adopted only vague positions in this respect. Tian Lu claimed that under these circumstances Sherman would be unjustly enriched if they were entitled to retain the purchase price paid by Tian Lu. Sherman claimed that it had suffered a loss as a result of the non-fulfilment of the sale but without specifying the extent of this loss.

Under the CISG system and, to the best of the Tribunal's knowledge, the majority of national legal systems, the expected and normal sequence of events following an unsuccessful claim by a purchaser for avoidance based on alleged non-conformity with the contract for goods delivered, would be that both Parties would have to perform under the contract. Should it prove that the seller is no longer able to perform because he has disposed of the goods by selling them to a third party, the buyer would, in turn, be entitled to avoid the contract for that reason. The buyer would also be entitled to claim damages to cover any proved loss as a consequence of the seller's failure to perform, including a right to be refunded any payments already made plus interest.

The seller, on the other hand, would be entitled avoid the contracts and/or to claim damages as compensation for any loss sustained as a consequence of the buyer's original failure to perform.

The seller might also have been entitled to take steps in order to mitigate his loss, e.g. by selling the goods to third party, thereby rendering himself unable to perform in the event the buyer is later held liable to take delivery. In such case, the seller bears a strict burden of proving his loss in order to be able to make any claim at all for damages.

In a situation such as the present one, in which the buyer has paid a certain part of the purchase price in advance or otherwise in accordance with an installment program, a seller would normally not be entitled to simply retain the purchase price paid in excess of his actual damage, should the buyer's claim for avoidance fail.

However, to trigger these further steps under the CISG system and enable an arbitral tribunal to decide the case on the basis of the sequence of positions described above, a buyer who has been notified that the seller is no longer able to deliver the goods in dispute would have to take a clear secondary position in case he were found not to be entitled to avoid the contracts on his first ground, i.e. non-conformity of the goods.

On the other hand, the seller would have to prove his actual loss in order to retain any part of the price received in advance as compensation for the loss sustained as a consequence of the buyer's original non-performance.

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

Even if the sale by Sherman (seemingly a cancellation by Sherman under its contract with ISG and re-sale by ISG of the Mill; the Tribunal has not been provided with sufficient information in this respect) has been found necessary by Sherman as a way of mitigating its loss following Tian Lu's purported avoidance of the Contracts, it is still unclear to the Tribunal, and no information in this respect has been provided by Sherman, what that loss actually is, if any. Should there be no loss at all Sherman would not be entitled, under the circumstances, to retain any part of the payment already made.

While the Parties executed a series of "contracts" and allocated specific amounts to certain of these contracts, the Tribunal has considered that all these individual contracts were integrated and that the individual contracts were properly viewed as a single integrated contract. The Tribunal notes, therefore, that the payment already made represents only part of an installment plan and did not reflect the value, per se, of the drawings for which payment was formally made under the relevant Contract. The aforesaid also applies to the cash payment of USD 60,000 made before dismantling of the equipment was allowed to start.

On the other hand, since Tian Lu's position as to Sherman's alleged unjust enrichment was so vague and did not include particulars as to the extent of that enrichment, in respect of which Tian Lu bears the burden of proof as so pleaded, there are insufficient grounds for Tian Lu being refunded all of what has been paid to Sherman.

Since neither of the Parties adopted the sequence of positions now described when pleading their respective cases – Tian Lu relying only, as a secondary position, on Sherman being unjustly enriched should it be entitled to retain the part of the purchase price already paid and Sherman having failed to provide sufficient information and evidence on the loss of profit claimed – it has not been possible for the Tribunal to follow this ordinary sequence of positions but, instead, those actually taken by the Parties. Therefore, the Tribunal, having also considered that it was not until at the Oral hearing that Sherman announced that the Mill had been (re-)sold to third party, finds as follows.

Tian Lu has paid Sherman in total an amount of USD 1,485,000. Tian Lu has not specified or provided evidence on the extent to which Sherman would be unjustly enriched. Sherman has been unable to prove that it sustained a loss of profit equal to this entire amount. In the Tribunal's opinion, in these circumstances a reasonable Award based on general principles of equity and fairness entails that Sherman be entitled to retain not more than 40% and obliged to refund 60% to Tian Lu of the amounts paid by Tian Lu and, under the special circumstances in this case, with interest only from the date of this Award at the Libor Interest Rate.

Tian Lu's claim for compensation for customs costs and inspection and commission fees falls since Tian Lu has been found not entitled to avoid the Contracts.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

Case 2:06-cv-00083-TFM   Document 209-4   Filed 06/26/08   Page 21 of 23
Case 2:07-cv-01323-FXC   Document 1-2   Filed 10/01/2007   Page 33 of 35

20

## 6.    The Costs

6.1    Pursuant to Article 40 of the Rules of the SCC Institute, the Parties are jointly and severally liable for the amounts and the compensation due to the SCC Institute and the Tribunal.

6.2    The losing party shall be ordered to pay such compensation and costs, as well as the costs of the other party, unless the circumstances dictate a different result.

6.3    Tian Lu's claim for avoidance of the Contracts has failed and Tian Lu has lost its case in this respect. However, Sherman is unable to perform its duties under the Contract by now delivering the Mill under the Contracts since the Mill has been sold to a third party, thereby depriving Tian Lu of the opportunity of taking delivery and, should this be more suitable to Tian Lu, selling the Mill in their own name to a third party. Further, Sherman has not provided evidence that their claimed loss of profit should entitle them to retain as compensation the full amount paid by Tian Lu.

Since the Tribunal has found that Tian Lu is entitled to be refunded 60% of the part of the payment already made by Tian Lu and that Tian Lu's claim for compensation for customs duties and inspection fees, etc. has failed, it is fair and equitable that the Parties bear their own costs in this Arbitration and that they share equally as between themselves the costs of the SCC Institute and the Tribunal.

6.4    The costs of the SCC Institute and the Tribunal.

In accordance Article 39 of its Rules, the SCC Institute has finally determined the costs in this Arbitration as follows.

*The SCC Institute*
Administrative fee                    EUR 14,328

*Mr Lars Boman*
Fee                                   EUR 34,354 and VAT EUR 8 588
Costs                                 SEK 32,828 (including costs for conference facilities at the Oral hearing) and VAT SEK 8 207

*Dr Wang Sheng Chang*
Fee                                   EUR 20 612
Costs                                 EUR  3 831
                                      SEK  8 950

*Mr John R McGinley*
Fee                                   EUR 20 612
Costs                                 USD  8 922.57



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

## PART C

The Tribunal, having taken on itself the burden of these references and having considered all written and oral evidence and arguments submitted, does hereby make, issue and publish this its

## FINAL AWARD

as follows, namely,

in respect of the matters of substance:

(i) Tian Lu's claim for the amount of USD 304,694 is dismissed;

(ii) Sherman is ordered to refund to Tian Lu an amount of USD 891,000;

(iii) Sherman is ordered to pay interest on the amount of USD 891,000 as from the date of this Award at the Libor rate until full payment has been m

in respect of the matter of costs:

(i) the Parties are ordered to pay, jointly and severally, to the SCC Institute an amount of EUR 14,328;

(ii) the Parties are ordered to pay, jointly and severally, the costs and fees of the Tribunal as follows:

To *Mr Lars Boman*

Fee EUR 34,354 and VAT EUR 8,588
Costs SEK 32,828 and VAT SEK 8,207

To *Dr Wang Sheng Chang*

Fee EUR 20,612
Costs EUR 3,831 and SEK 8,950

To *Mr John R McGinley*

Fee EUR 20,612
Costs USD 8,922.57



**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

RUSSING & NYGANDER 746558/05120

22

(iii)  as between the Parties, the SCC Institute's and the Tribunal's costs and the Tribunal's fees are to be shared equally and a party who has previously not paid his contribution to the costs in this arbitration is hereby ordered to compensate the other party accordingly.

Stockholm 2 June 2006

Lars Boman

John R. McGinley

ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF COMMERCE

John Bergman